UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JERROD JONES,

                    Plaintiff,

      -vs-

THE CITY OF ROCHESTER, NEW YORK,
ROCHESTER FIRE DEPARTMENT and
CAPTAIN JEFFREY KRYWY,

                  Defendants.

Civil Case No. 23-6287

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff, JERROD JONES, by and through his attorneys, Advocates for Justice, Chartered Attorneys, as and for his Complaint against the above-named Defendants, alleges as follows.

## NATURE OF THE CASE

      1.     This action is brought by Plaintiff, a firefighter for the City of Rochester, Rochester Fire Department seeking redress for racially hostile, discriminatory work environment pursuant to the Constitution of the United States of America, 42 U.S.C. § 1983, deprivation of rights, privileges and immunities under color of state law, and negligent training and supervision; 42 U.S.C. § 1981, Hostile Work Environment discrimination based on race; New York State Human Rights Law (hereinafter "NYSHRL"), N.Y. Executive Law § 296, *et seq*., and intentional infliction of emotional distress.

## PARTIES

      2.     Plaintiff, Jerrod Jones is a 15-year veteran of the City of Rochester Fire Department and is a resident of the Town of Irondequoit.

3.      The Defendant City of Rochester (the "City") is a municipality located within the County of Monroe, and State of New York with a business address at City Hall, 30 Church St., Rochester, NY 14614. At all relevant times, the City has been and is an employer of Plaintiff.

4.      Defendant Rochester Fire Department ("RFD") is a municipal organization with an address of 185 Exchange Blvd, # 665, Rochester, NY 14614.

5.      Defendant Captain Jeffery Krywy is a former Captain with the Defendant RFD. He is a resident of Defendant City of Rochester with an address at 50 Beresford Rd, Rochester, NY 14610.

## JURISDICTION AND VENUE

6.      Jurisdiction over Plaintiff's claims is conferred upon this Court by 28 U.S.C. § 1331 in that this action arises under the laws of the United States. The Court's supplemental jurisdiction is also invoked.

7.      Venue is proper in the United States District Court, Western District of New York pursuant to 28 U.S.C. § 1391(b) because Defendants have and continue to conduct business in the Western District of New York.

## STATEMENT OF FACTS

8.      In 2007, Plaintiff held a full-time position as an electrician, but opted to transition to a career as a firefighter.

9.      Out of the 2200 applicants who applied for the RFD that year, Plaintiff was one of only 77 individuals who achieved a perfect score. Among these top-scoring applicants, Plaintiff Jones was one of only two Black candidates.

10.     For years, the RFD has faced accusations of racial prejudice and discriminatory conduct towards minorities. Despite this, Plaintiff was motivated to submit an application to serve his community.

11.     Statistically, the RFD remains predominantly White and has predominately White leadership. According to the City of Rochester's official website, as of 2021, the Rochester Fire Department is made up of approximately 75% White individuals, 16% Black individuals, and 9% individuals of other races or ethnicities. The City of Rochester, however, is only 35.7% White and 41.2% African American.

12.     Plaintiff was subjected to bias and discrimination from the outset of his employment with the RFD.

13.     For instance, the recruitment process itself was unjust and discriminatory.

14.     Specifically, the psychological questioning conducted by Dr. Jay Supnick, who had a history of racial prejudice against Black individuals, nearly caused Plaintiff to resign.

15.     Supnick repeatedly probed Plaintiff about drug use, and when Plaintiff asserted that he had never smoked marijuana, Supnick accused him of dishonesty by asking, "How could you have grown up on Genesee Street and attend Marshall High School without using drugs?" Genesee Street and Marshall High School are in a predominantly Black neighborhood.

16.     Plaintiff nevertheless persisted and was ultimately offered a position from the regular pool of potential recruits, in large part because of his flawless score on the civil service examination.

17.     While undergoing training, Plaintiff observed the racially motivated mistreatment and ridicule directed towards a Black colleague, who was hired via the Trainee Program, a program

created to recruit firefighters from East High School, which serves a predominantly Black and minority student population.

18.     Throughout their training, the colleague was routinely targeted and belittled by instructors, who made a habit of singling him out for common errors and ridiculing him for having been hired through the Trainee Program. Furthermore, Plaintiff was frequently questioned as to why the colleague spoke and carried himself in a "ghetto" manner, with some instructors even going so far as to ask whether Plaintiff could get the colleague to behave more like Plaintiff.

19.     The instructors expected this colleague (who was much younger than Plaintiff) to fail his EMT exam, which would have dramatically decreased his employment chances with the RFD. Plaintiff provided daily assistance by studying together with his colleague, ultimately enabling him to pass the exam.

20.     Despite his efforts and aptitude, the colleague was accused of cheating by instructors. Specifically, they repeatedly stated that it was impossible for someone so unintelligent to have passed without cheating. This treatment was not extended to the White recruits.

21.     Following the completion of his training, Plaintiff commenced his employment as a full-time firefighter at the South Avenue station. It was here that a senior Black firefighter, cautioned him that he would experience racism, as had all Black firefighters who had come before him.

22.     Plaintiff was forced to work with a White firefighter, Mark Stevens, who openly made racist remarks, including expressing a lack of concern for Martin Luther King Jr. Day. When Plaintiff spoke out against this behavior, other firefighters discouraged him, insisting that senior firefighters like Stevens were "old school" and that challenging them would not result in any action by RFD.

23.     While at South Avenue Station, Steven mocked Trayvon Martin and other victims of police violence, repeatedly referring to Martin as a thug and saying "He got what he deserved." Many White firefighters were callous about Martin's murder, asserting that hoodies represented the wardrobe of criminals causing Chief John Caufield ban RFD hoodies.

24.     In the firehouse, right-wing radio and news stations played all day. Local conservative radio host Bob Lonsberry was invited to the station and treated like a VIP. He regularly eats lunch with the firefighters as an honored guest. Several Black firefighters, including Plaintiff, expressed that they objected to Losnberry's presence, but to this day Lonsberry continues to be invited for meals. No left wing or progressive public figures are extended the same opportunity.

25.     On one occasion, after a period of intense political debate regarding race relations within the RFD, a senior firefighter showed Jones a picture of his grandfather, former police chief, with his black Labrador retriever and several other individuals. The names of the chief and the other individuals were listed on the picture, including the name of the dog, which was "Nigger.".

26.     Plaintiff also observed the unequal treatment of Black neighborhoods and citizens, where firefighters showed disregard for property. Plaintiff even witnessed intentional demolition of property in Black neighborhoods by some Firefighters for what they joked was "training" purposes. For example, it was a practice to put a ventilation hole in a roof in less than dangerous situations in Black neighborhood to "prepare" for more dangerous situation later in White neighborhoods. They referred to this as "getting in reps." Firefighters rationalized their actions by asserting that poor and Black people failed to take care of their property anyway.

27.     On one occasion after responding to a minor "fender bender", Plaintiff was ordered to use the jaws of life to destroy a Black woman's car unnecessarily. After a heated confrontation

where the Plaintiff explained that the woman needed her car for work and it was safely operable, the lieutenant in charge left. Plaintiff Jones was the firefighter at the scene assigned to use the jaws of life, otherwise the woman's car would have been destroyed.

28.     Plaintiff voiced his opposition whenever he witnessed egregious behavior (such as with the jaws of life incident), but the prevailing attitude within the department was to prioritize cohesiveness over dissent. Any issues were expected to be dealt with internally.

29.     In 2020, Plaintiff became aware of the racist harassment and mistreatment that a young Black firefighter who worked in a firehouse with Battalion Chief Patrick Agostinelli. Agostinelli was known to publicly claim that the Trainee Program was an unwanted "affirmative action" program.

30.     The Black firefighter had been subjected to ongoing harassment and racist mistreatment by Lieutenant Paul Candello.

31.     Candello was notorious for his overtly racist views. At one point, during a live fire, Candello even tried to toss the helmet of a Black Captain, out of a window out of frustration that a Black firefighter had been promoted to captain before him.

32.     This careless action put the Captain's life in serious danger and instilled a sense of fear and intimidation among all Black RFD firefighters. These occurrences were widely recognized within the RFD and contributed to creating a rift between Black and minority firefighters and their White colleagues, leaving Plaintiff and others intimidated, embarrassed, and demoralized.

33.     In 2017, Plaintiff assumed a position in the Fire Chief's office for community outreach, where he worked in the same building with prominent members of the Rochester Police Department, including the current Irondequoit Police Chief, Scott Peters.

34.     After serving for four years doing community outreach, Plaintiff returned to a his previous role as a line firefighter on Truck 4 stationed on University Avenue.

35.     Although Plaintiff recognized that the RFD was flawed, he had attained a level of status that allowed him to avoid being subjected to racist rhetoric directly. More junior firefighters generally respected his senior position, while more senior firefighters were less willing to engage in direct confrontations with him or racist behavior in front of him.

36.     This general cordial tone did not extend to Defendant Krywy.

37.     Defendant Krywy was an assistant EMS instructor when Plaintiff was at the Academy and was present on the day of Plaintiff's exam. Respondent Krywy was Plaintiff's temporary lieutenant in the summer of 2011. Then, Respondent Krywy was assigned to University Avenue as Plaintiff's Captain on July 5, 2022. However, for the reasons that follow, Plaintiff and Defendant Krywy only worked one shift together.

38.     Plaintiff heard rumors regarding Krywy's use of racist language and his generally discriminatory conduct. Moreover, Plaintiff had personally observed several extreme, anti-immigrant, anti-Black social media postings by Defendant Krywy. Such behavior was not uncommon within the RPD, and Plaintiff had unavoidably learned to endure it.

39.     Plaintiff had been in the Department for 14 years and had become accustomed to coworkers with extremist and even racist views, so decided to judge Defendant Krywy based upon personal experience.

40.     Subsequently, after they began working together on Truck 4 in 2022, Plaintiff discovered that Defendant Krywy's racist behavior extended beyond his private social media posts and derogatory remarks. Former Chief Will Jackson informed Plaintiff that John Schriber, the

previous Chief, had shielded Defendant Krywy and instructed Jackson to discreetly resolve any lawsuit liability resulting from Defendant Krywy's extreme racist behavior.

41.     On July 7, 2022, Plaintiff was fulfilling his usual duties on Truck 4, which was stationed at 977 University Avenue. He was joined by three other firefighters: McKenzie ("Mack") Neal, Aurelio ("Angel") Perez, and their Captain, Defendant Krywy.

42.     Defendant Krywy, who was the officer in charge (again a Captain, which is one of the most powerful leadership positions in the RFD), notified Plaintiff, Neal, and Perez that he intended to take the firetruck or "rig" to attend a party in the district.

43.     It was not unusual for on-duty firefighters to participate in community events. However, Plaintiff felt apprehensive since it was a private party. Nonetheless, Defendant Krywy reassured the firefighters under his supervision that the party was outdoors and located within their district, leaving no plausible reason for them to remain behind. As a team, they always traveled together.

44.     All four firefighters wore their button-up RFD uniforms.

45.     In uniform and driving the rig they arrived at their destination on East Avenue in Rochester—a large private home in one of the city's most affluent communities.

46.     Plaintiff experienced immediate unease upon arriving at the location. His discomfort intensified as he proceeded up the driveway and saw a sizable cut-out of former President Donald Trump, a figure known for race-baiting and divisiveness.

47.     When he reached the end of the driveway and looked at the backyard, Plaintiff observed two large Juneteenth "celebration" flags adorning the lawn. Juneteenth was weeks before the party.

48.     He also saw buckets of Kentucky Fried Chicken displayed prominently, the use of the racist trope to ridicule Black Americans.

49.     Pictures of local democratic politicians, including members of the Rochester Police Accountability Board and Councilman Mitch Gruber, were displayed on stakes across the yard and the backyard. They literally had Democrats' heads on stakes.

50.     At the party, mockingly performed burlesque to a cheering crowd dressed Democratic County Legislator Rachel Barnhart, an outspoken participant in the Black Lives Matter Protests of 2020.

51.     The crowd became nervous upon seeing Plaintiff and the other firefighters. Their facial expressions looked shocked, and several people moved from the firefighters to distant corners of the yard.

52.     Several members of the crowd upon recognizing Defendant Krywy, approached the firefighter to welcome him. Plaintiff remained near the first table, feeling nervous.

53.     Neal stated to Plaintiff that they should not be there because it was against RFD rules to attend partisan political events or events that advocate for prejudice, hatred, or disparage the RFD.

54.     After finishing her performance, the Barnhart impersonator handed out bags of party favors to the crowd.

55.     The owner of the house, Nicholas Nicosia, a prominent local dentist, then approached Plaintiff as he was visibly distressed.

56.     Nicosia tried to mitigate any potential negative consequences of Plaintiff's presence by welcoming him and inviting him to come back and see La'Ron Singleterry—a Black

Republican congressional candidate and former police chief who Nicoisa was raising money for—in the following weeks.

57.     Meanwhile, Defendant Krywy was standing with the Barnhart impersonator a few feet away. She handed him one of the party favor bags, which was packed with racist tropes, including a bottle of Hennessey and a Juneteenth commemorative cup.

58.     Standing with the bag in his hand, Defendant Krywy acknowledged the inappropriate and offensive nature of the event, and ordered Plaintiff, Neal, and Perez firmly, "No pictures!"

59.     Nicosia then approached Defendant Krywy, and the two walked away whispering to each other.

60.     Unable to leave, Plaintiff stood at the back of the party, contemplating what to do. He expressed to Neal and Perez that he felt like he was in the movie "Get Out," a psychological horror film addressing race, racism and the fetishization of Black people.

61.     Despite Plaintiff's effort to remain on the outskirts of the party, a highly intoxicated guest approached Plaintiff and told him that he should not be offended, and that he should not take the party seriously because they were just "having fun." She appeared unaware of that a group of wealthy, White individuals "having fun" by mocking a sacred day that Black Americans fought for decades to have recognized as a federal holiday, is atrocious and hateful. She did not say anything similar to White attendees.

62.     She also told Plaintiff that they were all Trump supporters, and that Joe Biden was destroying the country, confirming that the party was a political event and the RFD's presence there was prohibited.

63.     Scanning the attendees, Plaintiff recognized several partygoers from his time working for the RFD. For example, he recognized Scott Peters, a former Defendant RFD Deputy

Chief and current Irondequoit Police Chief. Plaintiff worked with Peters had worked while in his office role. At the time of the racist party, Peters was working in the District Attorney's Office with the Major Felony Crimes as an Investigator.

64.     Plaintiff had seen Peters daily at the Public Safety Building.

65.     The intoxicated guest then became aggressively affectionate towards Plaintiff, hugging him and clinging to him, to the point that Plaintiff became acutely embarrassed by her racist conduct publicly hypersexualizing him while at the same time she participated in an event that dehumanized Black people.

66.     Plaintiff, Neal, and Perez were eager to leave and started to move towards the rig. Mary Znidarsic-Nicosia (the spouse of Doctor Nicosia) approached Plaintiff and asked Plaintiff if he wanted to take home the chicken.

67.     Plaintiff refused the chicken and started to walk away. Mary Znidarsic-Nicosia called after him, "You sure? It's KFC!" She did not ask Neal and Perez.

68.     Plaintiff, Neal and Perez waited for Defendant Krywy in the rig as he continued to glad-hand the crowd.

69.     Eventually, Defendant Krywy emerged. The total time of these events was approximately 40 minutes.

70.     The following morning, July 8, 2022, Plaintiff contacted acting battalion Chief George Smith to file a complaint about the incident. Smith expressed shock and promised swift action.

71.     Plaintiff hoped that the matter could be resolved internally within the RFD, a department he loves and serves proudly. He hoped his report would instigate change.

72.     Despite assurances that the matter would be investigated and addressed, Plaintiff was scheduled to work with Defendant Krywy again very shortly after filing his complaint with Smith. Neither Fire Chief Felipe Hernandez Jr. nor any other senior member of the RFD contacted Plaintiff to check on his well-being or investigate the incident.

73.     Defendant Krywy was not disciplined until Plaintiff held a press conference calling out the lack of action.

74.     Not until weeks later, Chief Hernandez sent a letter offering the opportunity to "talk."

75.     Since then, Plaintiff has suffered severe anxiety and repeated threats and intimidation. He has been diagnosed with post-traumatic stress disorder, that has permeated his daily life.

76.     Plaintiff has been warned by coworkers that he cannot return to work because he will face physical harm.

77.     Plaintiff has been unable to return to work and is not able to enjoy everyday activities as he was able in the past.

78.     Attendees at the party have not been similarly damaged.

79.     Scott Peters was subsequently appointed Chief of Police in Irondequoit.

80.     Scott Peters' wife, an employee of the District Court of the Western District of New York, called Plaintiff's attorney from her work phone in the courthouse and threatened to sue counsel if counsel exposed that Scott Peters attended the event. She also threatened to destroy Plaintiff and Plaintiff's family, including Plaintiff's brother (Randy Jones) who works with Peters's best friend at the Regional Transit Service. Plaintiff's attorney reported these threats to

the FBI and the Attorney General's Office, but, upon information and belief, no action was taken by her employer.

81.     The Nicosias have publicly admitted to hosting the party and operating extremely racist Twitter accounts used to harass members of the public and officials.

82.     They participate in a group called the "cabinet," that work together on Twitter and other social media sites using burner accounts to harass politicians and members of the media. The Nicosia's admitted to this in a live press conference and called their secret accounts "alternative identities". Scott Peters, upon information and belief, is a member of the "cabinet" using a burner account on Twitter.

83.     They have not suffered any adverse effects as a result of their actions.

84.     Plaintiff and his family, on the other hand, have been the subject of targeted harassment on social media.

85.     Plaintiff's girlfriend is being harassed online and in her occupation.

86.     There have been instances of individuals attempting to enter Plaintiff's home, which have been captured on camera, and of individuals repeatedly revving their cars outside his home in an attempt to intimidate him.

87.     Plaintiff has been pressured by several firefighters, including elected officials, to remain silent and or withdraw his claims.

88.     For example, on the morning of his press conference, he received calls from several elected officials pressuring him to drop his press conference and stay silent, even ordering him to meet in person before the press conference without the presence of his attorney.

89.     As a result, Plaintiff suffers from emotional distress and fear of retaliation from Defendant Krywy, Scott Peters and others.

90.     Plaintiff has taken a medical leave of absence to treat his emotional distress.

91.     Although Plaintiff hopes to return to work, he has been notified by two coworkers, on separate occasions, that it would not be safe for Plaintiff to return to work.

92.     Each coworker notified Plaintiff that there are several employees who are colleagues and also superiors of Plaintiff that are angry Plaintiff publicly disclosed the above-recited facts, have stated they "hate" Plaintiff and have recklessly shown a disregard for Plaintiff's life and well-being.

93.     Plaintiff must trust and rely upon his colleagues and coworkers because he works in situations that can be life-threatening, and, in fact, firefighters have lost their lives in the line of duty.

94.     Further, Plaintiff and Defendants are aware of at least one incident when a White Defendant RFD employee intentionally put at risk the life of a Black employee because of his race by making the Black employee's protective helmet unavailable while fighting a fire.

95.     As a result of Defendants' actions, Plaintiff has suffered loss of wages, loss of benefits, loss of reputation, loss of enjoyment of life, depression, nightmares, sleeplessness, stress, mental and emotion distress, self-doubt, fear, fear about finding new employment, and financial hardship, which damages are ongoing.

96.     On or about April 12, 2023, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Charge 525-2022-02110), which is currently under investigation.

## AS AND FOR FIRST CAUSE OF ACTION
### (Discrimination, Hostile Work Environment 42 USC § 1981)

97.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

98.     Plaintiff is a member of a protected class who has been subjected to discrimination and discriminatory practices as set forth above that has deprived him of his protected right to enjoy all benefits, privileges, terms and conditions of his contractual employment relationship based upon his race.

99.     Defendants' interference with Plaintiff's rights is intentional, malicious and in reckless disregard of Plaintiff's protected rights such that it shocks the conscience.

100.    Specifically, maintained a workplace that was racially hostile from the time Plaintiff began the hiring process.

101.    As a result of Defendants' actions, Plaintiff has suffered damages including economic damages, compensatory damages, costs, and attorneys' fees and interest.

## AS AND FOR SECOND CAUSE OF ACTION
### (Discrimination, Hostile Work Environment 42 USC § 1983)

102.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

103.    At all relevant times, Defendants acted under color of law.

104.    By Defendants' acts and practices in fostering a hostile work environment on the basis of race, Defendants have discriminated against Plaintiff with respect to his terms and conditions of employment in deprivation of his rights secured by the United States Constitution and laws and the Civil Rights Act of 1871.

105.    Defendants' conduct was outrageous and done with malice and/or reckless disregard to Plaintiff's rights such that it shocks the conscience.

106.    As a result of Defendants' actions, Plaintiff has suffered damages including economic damages, compensatory damages, costs, and attorneys' fees and interest.

## AS AND FOR THIRD CAUSE OF ACTION

### (N.Y. State Human Rights Law – All Defendants)

107.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

108.    Defendants City of Rochester and RFD are employers as set forth in New York State Executive Law.

109.    Defendant Krywy is a person as defined by New York State Executive Law.

110.    By their actions described above, Defendants City of Rochester and RFD have discriminated against, harassed, and subjected Plaintiff to a hostile work environment and disparate treatment because of his race, in violation of in violation of New York State Human Rights Law, New York Executive Law §296.

111.    Defendant Krywy aided and abetted Defendants City of Rochester and RFD in the discrimination and unequal treatment of Plaintiff.

112.    Defendants' conduct was outrageous and done with malice and/or reckless disregard to Plaintiff's rights such that it shocks the conscience.

113.    As a result of Defendants' actions, Plaintiff has suffered damages including economic damages, compensatory damages, costs, and attorneys' fees and interest.

## JURY TRIAL DEMANDED

114.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment:

a.      Enjoining Defendants from maintaining a racially hostile workplace.

b.      Awarding Plaintiff all lost pay and benefits.

c.      Awarding Plaintiff any and all additional statutory damages available under the law.

d.      Awarding Plaintiff emotional distress damages in an amount to be determined at trial but in no event less than $4,000,000;

e.      Awarding compensatory damages and damages for loss of reputation to Plaintiff in an amount to be determined at trial but in no event less than $1,000,000;

f.      Awarding Plaintiff attorneys' fees and costs, and

g.      Granting such other and further relief as the Court deems just and equitable.

Dated:  Rochester, New York
        May 24, 2023

                                        Respectfully submitted,

                                         /s/  *Nathan D. McMurray*
                                        Nathan D. McMurray
                                        ADVOCATES FOR JUSTICE,
                                        CHARTERED ATTORNEYS
                                        225 Broadway, Suite 225
                                        New York, New York 10007
                                        Phone: (212) 285-1400
                                        Cell: (917) 664-2036
                                        nmcmurray@advocatesny.com